Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence, or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence AFFIRMS in part and MODIFIES in part the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
STIPULATIONS
1. At the time of the injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Nationwide Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $320.00.
5. On August 13, 1990 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer.
6. Defendants paid compensation to plaintiff from August 14, 1990 through November 18, 1992.
7. In addition, the parties stipulated into evidence the following:
a) Form 19 dated August 16, 1990.
 b) First page of a letter from an unknown person at the Industrial Commission to Nationwide dated September 20, 1990.
c) Form 28B dated December 19, 1990.
d) Form 24 dated February 19, 1993.
e) Form 24 dated May 6, 1993.
f) 153 pages of medical records and reports.
g) 31 pages of additional medical reports from Dr. Dye.
* * * * * * * * * * * * * *
The Full Commission adopts in part and modifies in part the findings of fact of the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. As of August 13, 1990 plaintiff, who was then 51 years old, had been employed by defendant chiropractor for approximately two weeks as an x-ray technician. She was also being trained to perform some types of therapy.
2. During the time of this employment, plaintiff was on probation from the New Mexico Women's Correctional Facility for convictions arising from her having obtained narcotic medications by misrepresentation, fraud, forgery, deception or subterfuge. Charges relating to her having stolen medical records from a hospital and blank prescription pads from several doctors had been dropped. Instead of incarceration, it was recommended that she be placed in the custody of an inpatient psychiatric facility for long term treatment. Her sister, who lived in Greensboro, then petitioned for plaintiff to be sent to a facility close to her and her family where plaintiff could receive treatment and a chance to start over.
3. Consequently, plaintiff was sent to the Charter Hospital of Greensboro where she came under the care of Dr. Henschen, a psychiatrist. He diagnosed her as having recurrent major depression and a mixed personality disorder with characteristics of anti-social, paranoid and borderline disorders. After a period of treatment, however, he concluded that she primarily had a borderline personality disorder, which was a disorder often characterized by self-destructive behavior, abrupt mood swings, problems with substance abuse and problems with identity. Dr. Henschen treated her with a variety of medications, but none of them helped her consistently.
4. Plaintiff was discharged from Charter Hospital on March 1, 1990 after a month of inpatient treatment. Dr. Henschen continued to see her on an outpatient basis thereafter. She began working for another employer that spring and worked for several months before that job was terminated. She then began working for defendant employer.
5. On August 13, 1990 plaintiff sustained a compensable injury by accident when she tripped and fell on her right knee at work. She was seen by Dr. Paul, an orthopedic surgeon, who on August 17 performed arthroscopic surgery to her knee. He found a small tear of her medial meniscus, synovitis with bleeding and severe pre-existing chondromalacia. He then followed her recovery. She continued to complain of persistent pain and limitation of motion despite medication and physical therapy. After sending her to Dr. Dahners for a second opinion, he ordered an MRI. When presented with treatment options at that time, plaintiff pressed him to operate again, so on March 12, 1991 he performed another arthroscopic procedure in which he found degenerative changes and some adhesions.
6. Following the second operation, plaintiff did not progress as quickly as Dr. Paul felt that she should. She reported falling on the knee on April 1 and she presented with swelling in the leg later that month, but Doppler studies were negative. In May 1991 she was hospitalized under the care of Dr. Owens for anticoagulant therapy. However, he concluded that she did not have deep vein thrombosis and was suspicious of her due to her history of frequent injuries and the different histories she had reported to different doctors.
7. Plaintiff continued to see Dr. Paul and in July reported another injury where she allegedly slipped in the shower. In August her leg was again swollen but Dr. Paul noted signs of possible tourniquet use. She then developed symptoms of cellulitis and in September was hospitalized for treatment of that condition. Following her discharge, Dr. Paul's office learned that she had altered several prescriptions for narcotic pain medication. Consequently, on September 27, 1991 Dr. Paul confronted her with his opinion that she was wrapping her leg to create factitious edema. He believed that she was self damaging and refused to see her for five weeks and he refused to prescribe further pain medication for her. He recommend that she see Dr. Poehling at the pain clinic at Bowman Gray. On October 30, 1991 he finally released her from his care.
8. In October plaintiff began receiving treatment at Bowman Gray. Her condition was diagnosed initially as reflex sympathetic dystrophy, but the diagnosis was later questioned. Apparently Dr. Poehing was considering performing another operation to plaintiff's knee when she had another injury. On January 20, 1992 she apparently slipped and fell in a store, injuring her back. Dr. Nitka saw her in the emergency room on that date and later in his office. She asked him to also assume the care of her knee which had not been hurt in the fall. He agreed to do so but did not obtain records regarding her prior treatment. He found decreased range of motion and some swelling but noted that she was wearing her support stocking balled up around her ankle.
9. Plaintiff subsequently developed recurrent infections in her knee for which Dr. Nitka treated her. He began to suspect that she had Secretin's disease, a condition where the patient self-manipulates in order to cause swelling or other symptoms. Consequently, on March 16, 1992 he placed her leg in a cast so her access to the knee would be restricted. That infection then healed. He then sent her to physical therapy. However, she developed another infection below the kneecap in April and had to be hospitalized for it to be surgically cleaned. In June she developed another infection which worsened in July. Cultures of the wound revealed organisms which would be found in fecal material. Dr. Nitka pressed plaintiff to allow him access to her psychiatric reports but she refused at that time.
10. On August 10, 1992 Dr. Nitka confronted plaintiff with his belief that she was self inoculating bowel material into her knee in order to cause infections. He insisted that she allow him access to Dr. Henschen's notes, and on that date she signed a release. However, she rescinded it before Dr. Nitka could obtain the records.
11. Plaintiff had problems with recurrent bursitis and reported yet another injury to her knee in September, 1992. Dr. Nitka again casted her leg to allow the infection to heal. By December the bursitis was healed. At that time Dr. Nitka referred her back to Dr. Poehling for an opinion regarding whether she should have surgery based upon findings on an MRI which had suggested that she might have another meniscus tear. When plaintiff returned to him on February 4, 1993, she had blisters on her knee which she said were from using a heating pad. She advised him that Dr. Poehling intended to operate on her knee, so he planned to discharge her to Dr. Poehling's care. However, before she left his office that day she was caught with her chart which was missing multiple records because she had flushed them down the toilet. Consequently, Dr. Nitka refused to see her again.
12. Plaintiff then went to Dr. Dye, another orthopedic surgeon. He reviewed her MRI and concluded that she should have surgery, so on February 15, 1993 he performed an arthroscopic procedure. He found scar tissue and arthritic changes but no meniscus tear. Plaintiff developed an infection in the wound afterwards and had to be admitted to the hospital for further treatment. After another "relapse" the wounds healed.
13. Up until April 1993 plaintiff had continued to see Dr. Henschen for psychiatric treatment. Her mental condition vacillated throughout the time he treated her but remained essentially the same. During the time he was seeing her, he discussed with her his suspicions that she was dependent on Vicodin and that she was causing her repeated infections and physical problems. On these occasions, she would become very angry with him and would not admit to what she had done. Due to her extreme dependency needs and lack of motivation to improve, Dr. Henschen considered her prognosis to be poor. She stopped seeing him after April 1993. Since her probation had been conditional on her receiving psychiatric care, the probation period may have expired at that time. However, she apparently received treatment from a different psychiatrist for several months and then began seeing Dr. Smith.
14. Dr. Dye continued to treat plaintiff for her knee problems. She experienced further injuries and infections until the summer of 1993 and then began to complain of more problems with her back. In November he decided to try to get her off of narcotic pain medication and changed her prescription. However, she had another injury to her knee in January 1994 when she fell on it at church, and in February she reported two more falls onto the knee. Dr. Dye prescribed Vicodin for her on those occasions. When he examined her, he could not straighten out her leg and he attributed the loss of motion to anxiety on her part since he knew that the leg would straighten completely when she was under general anesthesia.
15. In March 1994 plaintiff presented with foreign bodies in her knee which she claimed had gone into the knee while she was kneeling in grass. Dr. Dye was unable to remove them with arthroscopic surgery so on May 4, 1994 he performed an open surgical procedure. During the operation he found three pieces of what appeared to be a sewing needle and some monofilament nylon which looked like fishing line. She improved following the operation but continued to not fully extend her knee. In July she developed some right hip pain because of the way she was walking. Dr. Dye continued to advised her to do exercises to strengthen her leg and improve her range of motion.
16. When plaintiff saw Dr. Dye on January 10, 1995, she indicated that she had had a sudden episode of sharp pain in her right knee. He did not change his treatment at that time, but by March she was complaining of her knee locking and he subsequently decided to perform another operation because her symptoms appeared consistent with a loose body in the knee. The surgery was performed May 10, 1994 and revealed severe dense adhesions but no loose bodies or torn cartilage. He then sent her to physical therapy even though it was not funded.
17. Defendants originally admitted liability for benefits under the Workers' Compensation Act for plaintiff's injury. Although the Form 21 agreement was returned by the Industrial Commission and not approved at that time, they paid compensation to her for temporary total disability until November 1992. By that time her medical reports indicated that her problems were self-inflicted. They subsequently filed two Form 24 requests to stop payment with the Commission which were denied. Defendants voluntarily stopped paying compensation to plaintiff on November 18, 1992.
18. The Form 21 was ultimately approved by the Industrial Commission on February 10, 1993, after the dispute as to ongoing compensation had arisen. Defendants refused to resume payment of compensation after approval of the Form 21 agreement. Plaintiff then moved that defendants be ordered to reinstate compensation and that a penalty and sanctions be assessed. Her motion was denied by order of Deputy Commissioner Nance on behalf of the Executive Secretary's office filed June 8, 1993. Although Deputy Commissioner Nance found that the Form 21 Agreement was improvidently approved, the agreement was not set aside. There was no evidence offered which tended to show that the agreement was entered into as the result of fraud, misrepresentation, undue influence or mutual mistake.
19. The injury plaintiff sustained on August 13, 1990 should have resolved within three to six weeks after her initial surgery. However, by no later than September 27, 1991, she was intentionally causing swelling in her leg and by March 16, 1992, she was manipulating her knee with at least the intent to cause infection. Her pattern of self damaging behavior continued and caused her to require ongoing medical treatment. She inoculated her knee with fecal material and would refuse to move it fully in order to damage the joint. Many of her recurrent injuries were also not accidents but were further attempts on her part to harm herself.
20. Plaintiff had a borderline personality disorder and had extreme dependency needs along with poor impulse control. She was also dependent on Vicodin, a narcotic pain medication. Her psychiatric condition was pre-existing and was not aggravated by the injury at work.
21. Plaintiff's continuing disability and need for medical treatment was due to her own intentional misconduct and to her willful intent to injure herself. Consequently, the chain of causation between her injury by accident and her knee condition was broken. If not for her self-mutilation, her symptoms would have resolved to the point that she could have returned to work. By the time she was hospitalized on April 23, 1992 for infection in her knee, her condition was clearly related to self-mutilation and her subsequent disability was therefore unrelated to this injury. Although her prior symptoms could also have resulted from her manipulation of the knee, the evidence was not sufficient to establish that fact until March 16, 1992 even though her behavior all along was suspicious and she was clearly wrapping her leg to create swelling by September 1991.
22. Treatment arising from the swelling of plaintiff's leg and the recurrent infections did not arise from her injury at work after March 16, 1992.
23. As a result of her work-related injury by accident, plaintiff sustained a 10% permanent partial impairment to her right leg
24. The Industrial Commission could not approve defendants' Form 24 application to stop payment because defendants were not paying plaintiff pursuant to an approved agreement constituting an Order of the Commission.
* * * * * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
CONCLUSIONS OF LAW
1. The Form 21 agreement which was ultimately approved in this case was not specifically set aside by the order of Deputy Commissioner Nance filed June 8, 1993 and was binding on the parties in that there was no showing that it was entered into as the result of error due to fraud, misrepresentation, undue influence or mutual mistake. G.S. § 97-17; Pruitt v. Knight Publishing Company, 289 N.C. 254 (1976).
2. The aggravation of a compensable injury by accident, or the development of a distinct new injury, is compensable when the primary injury is shown to have arisen out of and in the course of employment, and when the subsequent aggravation or new injury is a natural consequence that flows from the primary injury. Heatherlyv. Montgomery Components, Inc., 71 N.C. App. 377, 323 S.E.2d 29
(1984). This principle contemplates that the aggravation is either, in the normal course of events, a natural, or conceivably understandable occurrence, and that this occurrence either aggravates the first injury or produces a second, new injury. Plaintiff suffers from a mental disease that causes her to self-mutilate; however, plaintiff's subsequent falls and infections did not flow naturally or directly from the injury by accident, but were the direct result of plaintiff's aberrant behavior caused by ongoing mental illness. Plaintiff's mental illness was not materially aggravated by her work-related injury.
3. In that the disability plaintiff sustained beginning March 16, 1992 was due to her own intentional misconduct and her willful intent to injure herself, she was not entitled to further compensation for temporary total disability after said date. G.S. § 97-29; Starr v. Charlotte Paper Company, 8 N.C. App. 604 (1970);Brewington v. Rigsbee Auto Parts, 69 N.C. App. 168 (1984); G.S. § 97-12 (3); Wagoner v. Douglas Battery Manufacturing Co.,89 N.C. App. 67 (1988), cert. denied, 322 N.C. 486 (1988).
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, but not for the factitious edema, infections and unrelated injuries to her knee. G.S. § 97-2(19); G.S. § 97-25.
5. Although defendants terminated payment of compensation without approval of the Industrial Commission, since no further compensation was due, plaintiff is not entitled to a penalty to be assessed against them for late payment. G.S. § 97-18.
6. Plaintiff is entitled to permanent partial disability compensation at the rate of $213.34 per week for 20 weeks for the 10% permanent partial impairment to her right leg. Defendants are entitled to a credit for the overpayment of temporary total disability paid to plaintiff after March 16, 1992.
* * * * * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
AWARD
1. Plaintiff is not entitled to further compensation for temporary total disability.
2. Plaintiff is entitled to permanent partial disability compensation at the rate of $213.34 for 20 weeks for the permanent partial impairment to her right leg. Defendants are entitled to a credit offset for the 35 2/7 weeks of overpayment of temporary total disability to plaintiff. Consequently, no further compensation is due plaintiff for permanent partial disability.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident through March 16, 1992.
4. Plaintiff is not entitled to have a penalty assessed against defendants for late payment of compensation.
5. Defendants shall pay the costs due this Commission.
 S/ ___________________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ _________________________ THOMAS J. BOLCH COMMISSIONER
S/ _________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
BSB:md